UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

REGINA D. WEBB,

                Plaintiff,         Civil Action No.: 14-12332
                                    Honorable Avern Cohn
                v.             Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                Defendant.
_____/

## REPORT AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT [R. 11, 12]

Plaintiff Regina Webb appeals a final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application

for Disability Insurance Benefits ("DIB") under the Social Security Act (the

"Act").  Both parties have filed summary judgment motions, which were

referred to this Court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B).  The Court finds that the ALJ did not err in her

evaluation of Webb's physical or mental conditions and did not run afoul of

the pertinent regulations governing her analysis.  The Court further finds

that the ALJ's decision is supported by substantial evidence of record.  For

these reasons, the Court **RECOMMENDS** that:

- Webb's motion for summary judgment **[R. 11]** be **DENIED**;

- the Commissioner's motion **[R. 12]** be **GRANTED**;

- the decision be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   BACKGROUND

Webb was age 50 at the time of the hearing and had worked for the City of Flint as a street maintenance worker from 1997 until June 2012.  [R. 8-2, Tr. 50, 52-54; R. 8-6, Tr. 176].  She developed carpal tunnel syndrome ("CTS") in 2002, and claims to have received workers' compensation and then to have been reassigned in 2007 to an administrative position.  [R. 8-2, Tr. 29-30, 34, 50-51].  However, she remained classified as a street maintenance worker until she was laid off in June 2012.  [R. 8-2, Tr. 50; R. 8-6, Tr. 166, 176].  The record includes no independent evidence of Webb's period of workers' compensation or her altered job duties.  Webb alleges that she became disabled after her lay-off due to her CTS, anxiety and depression.  [*Id.*].

### A.   Procedural History

On June 13, 2012, Webb filed an application for DIB, alleging disability as of June 8, 2012.  [R. 8-5, Tr. 147-48].  The claim was denied initially on October 19, 2012, and Webb filed a timely request for an

administrative hearing.  [R. 8-4, Tr. 88-99].  At the January 23, 2014,

hearing, an administrative law judge (ALJ") heard testimony from Webb

(represented by counsel) and a vocational expert ("VE").  [R. 8-2, Tr. 27-

67].  In a March 27, 2014, written decision, the ALJ found Webb not

disabled.  [*Id.*, Tr. 9-26].  On May 24, 2014, the Appeals Council denied

review, making the ALJ's decision the final decision of the Commissioner

for purposes of this review.  [*Id.*, Tr. 1-4].  Webb filed for judicial review of

the final decision on June 13, 2014.  [R. 1].

### B.    Evidence in the Record

Although the ALJ found that Webb has several severe impairments,

[R. 8-2, Tr. 14], Webb challenges only the ALJ's assessment of her CTS,

depression and anxiety.  [R. 11, PgID 388-92].  The records related to the

conditions at issue will be summarized below.

### 1.    *Plaintiff's Testimony and Subjective Reports*

Webb testified that her CTS caused pain, numbness and weakness in

her hands, and caused her hands to "lock up" and drop things, which made

it hard for her to lift more than five to ten pounds or use her hands for more

than five to ten minutes.  [R. 8-2, Tr. 35, 39, 45-46].  As a result, she had

trouble with personal care and household chores, performed no yard work

and had trouble sleeping.  [*Id.*, Tr. 35-36, 41-42; R. 8-6, 191-92, 206].

3

However, her daily activities did include some light chores, including laundry and dish washing.  [R. 8-6, 191-92].  She treated her CTS with pain medications, braces, heat therapy and homeopathic remedies.  [R. 8-2, Tr. 36].

Webb testified that the city job to which she was reassigned after a period of workers' compensation was a "make work" job, designed specifically for approximately ten city workers who had previously been on worker's compensation.  [R. 8-2, Tr. 30; 50-52].  Although she testified that her sole responsibility was to answer about four or five phone calls in an eight-hour day, she listed the additional duties of filing, processing mail and waiting on customers on a work history form.  [R. 8-2, Tr. 51; R. 8-6, Tr. 177].

Webb claimed to also suffer from anxiety and depression.  [R. 8-2, Tr. 36; R. 8-6, Tr. 166].  She testified that there were days when she did not get out of bed, and that these occurred in clusters of up to a week at a time.  [R. 8-2, Tr. 47].  Webb described herself as having difficulty concentrating, but being capable of following instructions.  [R. 8-2, Tr. 47; R. 8-6, Tr. 195-96].  She got along well with others, but did not handle stress or changes in routine well.  [R. 8-6, Tr. 195-96].  Webb treated her mental health issues with Xanax prescribed by her primary care physician.  [R. 8-2, Tr. 37].  She

4

testified she had also begun treating again with a psychiatrist at the recommendation of her primary care doctor, due to a recurrence of her depression.  [*Id.*, Tr. 43].

Webb testified that she had no hobbies, that her only social activity was going to church "from time to time," and that she only drives to the doctor and her mother's house.  [*Id.*, Tr. 41-42].  She testified at the hearing that she does not really shop, but her earlier report of her daily activities indicated that she shopped for an hour or two, once or twice a week.  [*Id.*, Tr. 41; R. 8-6, Tr. 193].

### 2.    *Medical Evidence*

#### a.    *Carpal Tunnel Syndrome*

In 2002, an EMG of Webb's upper extremities revealed bilateral CTS, which orthopedic surgeon A. George Daas M.D. described as mild.  [R. 8-7, Tr. 256, 285].  Dr. Daas opined that she could go back to work, although she might need a wrist support.  [*Id.,* Tr. 285].  In January 2003, Dr. Daas wrote that Webb was not an operative candidate and that he did not "think she has significant carpal tunnel."  [*Id.*, Tr. 284).  He further opined that any job "she may do repetitively may cause pain."  [*Id.*].

Webb underwent two additional EMGs in 2004, which revealed moderately-severe bilateral CTS, with more pronounced symptoms on her

right side.  [*Id.,* Tr. 258-65].  In October 2004, she treated with Dr. Thomas

Beird, who noted that Webb had been off work for a year due to restrictions

and had not improved with conservative treatment.  [*Id.*, Tr. 263].

For the next eight years, the only relevant medical records

documented no complaints of CTS symptoms, and normal exams of

Webb's wrists.  [R. 8-7, Tr. 233; 235-36; 239].  During a February 2012 an

examination with primary care physician Dr. Elmadhi Saeed, Webb

reported that symptoms of CTS had surfaced "months ago."  [*Id.*, Tr. 225].

The exam revealed that Webb had a tender left wrist and positive Phalen's

and Tinel's tests, bilaterally, that were consistent with CTS.  [*Id.*, Tr. 227].

She again complained of CTS symptoms in March and May 2012.  [*Id.*, Tr.

219-24].  An EMG conducted on May 22, 2012, revealed "bilateral median

dysfunction at the wrist, right more than left, carpal tunnel syndrome,

sensory and motor, demyelinating and axonal and moderate in nature."

[*Id.*, Tr. 214].  At a follow-up a week later, Webb did not specifically

complain of CTS symptoms and Dr. Saeed's exam revealed "right wrist

benign" and "normal left wrist."  [*Id.*, Tr. 216-18].

Webb returned to Dr. Saeed twice in August and once in September

2012, complaining of CTS symptoms.  [*Id.*, Tr. 248, 314-22].  An exam was

conducted at the second appointment, revealing right wrist tenderness,

6

swelling and pain with range of motion, as well as bilateral reduced flexion, and positive Phalen's and Tinel's tests.  [*Id.*, Tr. 321].

When Webb returned to Dr. Saeed in May 2013, an exam revealed bilateral wrist tenderness, decreased flexion with pain, positive Phalen's and Tinel's tests, and left wrist swelling, and Dr. Saeed recommended physical therapy.  [R. 8-7, Tr. 325-26].  An exam at a July 2013 follow-up revealed similar test results, but Dr. Saeed did not further recommend physical therapy and there is no indication that Webb ever received any. [*Id.,* Tr. 338].  When Webb presented with similar findings at an examination in September 2013, Dr. Saeed urged her to continue with her anti-inflammatory and pain medications and opined that Webb was "still disabled."  [*Id.*, Tr. 334-35].  Webb treated with Dr. Saeed three more times in 2013.  [*Id.,* Tr. 330-332].  His rudimentary reports from those visits suggest that Webb complained of hand pain only once, and that he conducted no further examinations. [*Id.*].

On October 17, 2012, Dr. Quan Nguyen, a consultant for the State agency, reviewed Webb's medical records and, relevant to this appeal, opined that she was capable of lifting 10 pounds frequently and 20 occasionally, with an unlimited ability to push or pull within those weight restrictions.  [R. 8-2, Tr. 76].  He further found she could only occasionally

7

climb ladders, ropes or scaffolds, but had unlimited ability to engage in other postural activities.  [*Id.*, Tr. 77].  She was limited to only frequent handling due to her CTS, but with no limitation to fine manipulation using her fingers.  [*Id.*, Tr. 77].  Dr. Nguyen opined that Webb should avoid concentrated exposure to vibration.  [*Id.*, Tr. 77-78].

### b.    Depression and Anxiety

Records related to Webb's depression and anxiety begin in 2011, when she was diagnosed with major depression by Dr. Nikhil Vora at Delta Family Clinic and treated with a therapist from March to June of that year. [R. 8-7, Tr. 294-308].  She was prescribed Celexa, Xanax and Desirel.  [*Id.*, Tr. 296].  Her discharge summary stated she was being discharged due to an improved condition with a good prognosis.  [*Id.*, Tr. 294].  Her global assessment of functioning ("GAF") score at admission was 45, and at discharge it was 70.[1]  [*Id.*].

During her visits with Dr. Saeed in August, October and December

---

[1] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below.  Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning."  *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 461 Fed. Appx. 433, 436 n.1 (6th Cir. 2012) (citations omitted).  Scores in the range of 61-70 indicate some mild symptoms.  *Karger v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 739, 745 (6th Cir. 2011).  .

2011, Webb described the symptoms of her anxiety and said that they were alleviated by medication.  [*Id.*, Tr. 228-36].  Dr. Saeed did not conduct any mental health examinations during those visits, but he noted that Webb's medications included Xanax and Cymbalta, and he added Celexa in December.  [*Id.*].

When Webb returned to Dr. Saeed in February 2012, she reported both depression and anxiety, and her mood was assessed as "depressed and anxious."  [R. 8-7, Tr. 225-27].  Dr. Saeed did not modify her treatment. [*Id.*].  She treated with Dr. Saeed six more times in 2012, almost always complaining of depression, anxiety or both.  [*Id.,* Tr. 216-24; 248; 314-22]. Although Dr. Saeed diagnoses included depressive disorder and anxiety, he did not conduct any other mental health testing and made no alterations in her treatment plan.  [*Id.*].

In October 2012, Webb underwent a consultative psychological examination with Dr. Marianne Goergen at Bright Horizons Psychological Center.  [*Id.*, Tr. 250-53].  Dr. Goergen documented Webb's description of her mental health complaints, treatment, personal history, daily and social functioning, interests and activities.  [*Id.*, Tr. 250-51].  She detailed her Webb's general appearance and her clinical examination. [*Id.*, Tr. 251-52]. Dr. Goergen's findings led her to diagnose Webb with severe major

9

depressive disorder and panic disorder without agoraphobia, to issue GAF score of 35-45, and to describe Webb's prognosis as guarded. [*Id.,* Tr. 253]. She opined that Webb "likely would demonstrate difficulty relating with others due to her level of irritability and decreased concentration. Once she became comfortable, she likely would be able to handle more complex tasks with minimal supervision." [*Id.,* Tr. 252].

Webb continued to appear depressed and anxious during her appointment with Dr. Saeed in May 2013. [R. 8-7, Tr. 324-26]. The doctor advised Webb to "continue psychiatric intervention," [*Id.*, Tr. 326], but there are no records reflecting any psychiatric treatment during that time. Throughout the remaining five visits in 2013, Dr. Saeed documented Webb's varying complaints of depression and anxiety, and consistently referred to her need to continue psychiatric treatment, but never conducted any mental health examinations. [*Id.*, Tr. 330-38].

Webb returned to Dr. Vora at Delta Family Clinic on January 14, 2014. [*Id.*, Tr. 289-93; 312]. She cried during the initial session and had difficulty maintaining eye contact. [*Id.*, Tr. 289]. Webb's conversation was scattered, her affect was flat, her mood was unstable and her thought control was irrational. [*Id.*, Tr. 291]. However, she was well oriented, her memory was intact and her intellect was adequate. [*Id.,* Tr. 291-92]. Webb

displayed average memory, reasoning and judgment, but variable consciousness and less than sustained attention.  [*Id.*,Tr. 292].  Dr. Vora diagnosed Webb with major depression and assessed a GAF score of 52. [*Id.*].  Her prognosis was fair and her recommended length of treatment was six months.  [*Id.*, Tr. 293].

Webb had two therapy sessions in with therapists in Dr. Vora's clinic in January 2014, during which she presented as sobbing and unable to talk, but left feeling better.  [R. 8-7, Tr. 310-11].  On January 22, 2014, another psychiatrist whose name is hard to decipher wrote a consultation report to Dr. Vora, stating that Webb made little eye contact, and felt hopeless and helpless, but was not suicidal.  [*Id.,* Tr. 309].  The doctor diagnosed her with major depression, opined that her cognitive skills were compromised, and discussed with her the possibility of going to the emergency room.  [*Id.*].

On January 30, 2014, Dr. Vora issued a medical source statement opining that Webb had a poor ability to understand, remember or carry out simple or complex instructions due to poor thought organization, comprehension and memory, that she had a poor ability to behave in an emotionally stable manner, relate in social situations or demonstrate reliability due to emotional instability.  [*Id.*, Tr. 340].  Dr. Vora further opined

11

that Webb would be unable to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently or maintain concentration or attention, due to her depression, compromised cognition, crying, anxiety, helplessness and hopelessness.  [*Id.*, Tr. 341].  Dr. Vora issued Webb a GAF score of 45 and stated that she would be unable to manage her own benefits.  [*Id.*, Tr. 340].

## C.   The ALJ's Application of the Disability Framework

DIB is available for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps.  First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled.  20 C.F.R. § 1520(a)(4); 20 C.F.R. § 416.920(a)(4).[2]  Second, if the claimant has not

---

[2] Sections 1520(a)(4) and 920(a)(4), which pertain to DIB and SSI respectively, list the same five-step analysis.

had a severe impairment or a combination of such impairments[3] for a continuous period of at least 12 months, no disability will be found. *Id.* Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.* If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity ("RFC"), and will find the claimant not disabled if he or she can still do past relevant work. *Id.* At the final step, the Commissioner reviews the claimant's RFC, age, education and work experiences, and determines whether the claimant could adjust to other work. *Id.* The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following the five-step sequential analysis, the ALJ determined that Webb was not disabled. At step one, she found that Webb had not engaged in substantial gainful activity since her alleged onset date. [R. 8-2, Tr. 14]. At step two she found that Webb suffered from severe impairments including CTS, depression and anxiety. [*Id*]. At step three,

---

[3] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 1520(c); 920(c).

the ALJ determined that none of Webb's severe impairments, either alone or in combination, met or medically equaled a listed impairment, specifically comparing her relevant impairments to Listing 1.02 (Major dysfunction of a joint), 12.04 (Affective disorders), and 12.06 (Anxiety-related disorders). [*Id.*, Tr. 15-16]. In making this comparison, the ALJ concluded that Webb's mental impairments caused her mild limitations in her activities of daily living, moderate limitations in social functioning and moderate limitations in her ability to maintain concentration, persistence and pace, with no episodes of decompensation. [*Id.*, Tr. 16-17].

Next, the ALJ assessed Webb's RFC, finding her capable of a limited range of light work. Relevant to Webb's appeal the ALJ stated:

> the claimant is limited to lifting/carrying and pushing/pulling 5 pounds frequently and 10 pounds occasionally; the claimant should not climb ropes, ladders or scaffolds . . . [and] should not be required to crawl; . . . the claimant is limited to frequent handling, fingering and feeling, with no continuous writing; work should involve no concentrated exposure to vibration or use of vibrating tools; work should involve no exposure to extremes of cold; the claimant is limited to simple, routine, repetitive, 1 and 2-step tasks not performed at a production rate pace (e.g. no assembly line work); work should involve only minimal changes in the work setting; and work should not require interaction with the public, or more than occasional routine contacts with coworkers and supervisors.

[*Id.*, Tr. 18]. At step four, the ALJ found that, based on the above RFC, Webb could not perform her past relevant work as a telephone clerk or

14

municipal maintenance worker.  [*Id.,* Tr. 21; 54].  At step five, the ALJ

concluded, with the assistance of VE testimony, that there were a

significant number of other jobs in the national economy that a hypothetical

claimant of Webb's age, education, vocational background and RFC could

still perform such that Webb was not disabled under the Act.  [*Id.*, Tr. 21-

22].  The VE specifically identified the jobs of administrative support worker

(100,000 jobs in the nation), packer (110,000 jobs), assembler (200,000

jobs) and machine operator (150,000 jobs).  [*Id.*, Tr. 22; 58-59].  The VE

further testified that if the hypothetical claimant were off task more than

20% of the workday or could only handle objects occasionally, instead of

frequently, such limitations would preclude gainful employment.  [*Id.,* Tr.

61].

## II.   STANDARD OF REVIEW

Pursuant to § 405(g), this Court's review is limited to determining

whether the Commissioner's decision is supported by substantial evidence

and was made in conformity with proper legal standards.  *Gentry v. Comm'r*

*of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Substantial evidence is

"more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241

15

(6th Cir. 2007) (internal quotation marks and citation omitted).  Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence.  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).  "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards.  "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723.  *See also Rogers*, 486 F.3d at 249.  In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

16

The Commissioner must also adhere to its own procedures, but failure to do so constitutes harmless error unless the claimant has been prejudiced or deprived of substantial rights. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless. *Id.* at 655-56. On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not harmless. *Id.*; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011); *Gentry*, 741 F.3d at 729. An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 939-40 (internal quotation marks and citation omitted).

With these standards in mind, this Court finds that the ALJ's determination that Webb is not disabled is legally sound and supported by substantial evidence.

## III.    ANALYSIS

Webb raises three challenges to the ALJ's decision. First, she argues that the ALJ erred in finding that her "make-work" telephone clerk job constituted substantial gainful activity to a support the conclusion that she retained the RFC to engage in a significant number of other jobs in the

17

national economy.  Second, she argues that the ALJ's finding that she could engage in frequent handling with her hands is not supported by the medical evidence or her testimony.  Finally, Webb argues that the ALJ erred in giving little weight to Dr. Vora's medical source statement.  The Court addresses each argument in turn.

### A.    Reliance on Webb's Alleged "Sheltered Work"

The ALJ found that Webb was engaged in substantial gainful activity ("SGA") through June 8, 2012, and found that Webb's ability to work through that period supported a finding at step five that her CTS was not disabling.  [R. 8-2, Tr. 14 & 19].  Specifically, the ALJ noted that Webb's moderate CTS remained stable for years, despite the fact that she "worked for much of that period" and that Webb should be capable of performing the level of manipulation contemplated by the RFC, given the stable nature of her condition "including through work years."  [*Id.*, Tr. 19].  Webb argues that her position for the last six year of her employment constituted "sheltered work" and should not have been considered as evidence that she was capable of SGA.  [R. 11, PgID 384, 390].

In so arguing, Webb relies entirely on her own account of her work duties during the last six years of her employment with Flint; she provided no independent evidence of her work duties during that time period.  [*Id.*,

18

citing R. 8-2, Tr. 30-31, 50-51].  At the hearing, Webb described her last six

years at Flint as sheltered work, but the ALJ responded that an employer's

report of the claimant's duties is generally required to determine whether

the claimant performed sheltered work under the pertinent regulation.  [R.

8-2, Tr. 63-64].  The ALJ was right to find that Webb's testimony alone was

insufficient to establish that she performed sheltered work that should not

be considered SGA.  *Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d

315, 319 (6th Cir. 1990) (finding that claimant failed to meet burden of

showing that her work at the Post Office was sheltered work pursuant to 20

C.F.R. § 404.1574(3)).

Additionally, the ALJ's reference to Webb's SGA through 2012 was in

the context of her determination that Webb's statements regarding her

limitations were not fully credible.  [R. 8-2, Tr. 18-19].  Webb asks the Court

to rely exclusively on her description of her work duties during her last six

years with Flint, but an ALJ's credibility finding may not be disturbed absent

a "compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. Ohio

2001).  Courts generally defer to an ALJ's credibility finding because "[t]he

opportunity to observe the demeanor of a witness, evaluating what is said

in the light of how it is said, and considering how it fits with the rest of the

evidence gathered before the person who is conducting the hearing, is

19

invaluable, and should not be discarded lightly." *Keeton v. Comm'r of Soc. Sec.*, 583 Fed. Appx. 515, 531 (6th Cir. 2014) *quoting Beavers v. Sec. of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978).  Nonetheless, an ALJ must sufficiently explain the bases of credibility determinations. "[B]lanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." *Id.* at 248.

The ALJ's discussion regarding the credibility of Webb's claimed limitations is extensive, [R. 8-2, Tr. 18-19], and will be analyzed more fully below.  For the purposes of Webb's "sheltered work" argument, the Court finds no compelling reason to disturb the ALJ's credibility determination. Although Webb testified that her sole responsibility was to answer about four or five phone calls in an eight-hour day, she listed the additional duties of filing, processing mail and waiting on customers on a work history form. [R. 8-2, Tr. 51; R. 8-6, Tr. 177].  Thus, the ALJ's determination that Webb's work at Flint demonstrates that she is not as limited as she claims has support in the record.

Moreover, even if Webb was not engaged in SGA for the last six years with the City, the ALJ's finding that she is not disabled should not be disturbed if the record as a whole supports that determination.  *Dekrueger*

20

*v. Astrue*, No. 08-10410, 2009 U.S. Dist. LEXIS 132579, at *31 (E.D. Mich. Feb. 17, 2009) *adopted by* 2009 U.S. Dist. LEXIS 20145, 2009 WL 596123, *12 (E.D. Mich. Mar. 9, 2009) (even if claimant correct that past work was not SGA, error harmless where record as a whole supported determination that she was not disabled). Here, even if the ALJ erred in determining that Webb's past work constituted SGA, the error would be harmless.

## B.   RFC Limitation to Frequent Handling

Webb argues that the ALJ's limitation only to frequent handling is unsupported by the record.  To support this argument, Webb points to her own testimony and to objective medical evidence demonstrating that she suffers from CTS.  [R. 11, PgID 389].  However, no doctor has offered an opinion more limiting that the ALJ's RFC.  In fact, the only doctor to assess Webb's handling ability was consultant Dr. Nguyen, and he determined that she was capable of frequent handling.  [R. 8-2, Tr. 76-77].  So, Webb's reliance on the medical records as an indication that she is limited to occasional handing is misplaced.

Webb's argument therefore boils down to a challenge to the ALJ's credibility assessment.  Webb reported that she could only use her hands for 5-10 minutes at a time before needing to rest them for 20 minutes.  [*Id.*, Tr. 45].  The ALJ declined to credit this subjective evidence because the

objective medical evidence of record and Webb's own reported activities of

daily living did not support such limited restrictions.  The ALJ pointed to the

fact that Webb's condition had remained relatively stable since her first

EMG of record in 2002, and noted that Webb's treatment was consistently

conservative and had never intensified despite her claims of worsening

pain.  [*Id.,* Tr. 19].  An ALJ is permitted to base her credibility determination

on the claimant's "longitudinal medical record demonstrating an individual's

attempts to seek medical treatment for pain or other symptoms and to

follow that treatment once it is prescribed."  SSR 96-7p, 1996 SSR LEXIS

4, 1996 WL 374186, at *7 (July 2, 1996).

Consistent with the ALJ's findings, the record does not show that

Webb ever received surgery or physical therapy for the CTS.  Webb

reported that she was denied physical therapy, [R. 8-6, Tr. 203], but there

is no evidence of that in the medical record.  Further, her EMG results were

virtually unchanged between 2004 and 2012, and her treatment remained

conservative during this time with no noticeable changes in either the type

or dosage of her medications.  [R. 8-7 Tr. 214; 225-27; 248; 258-61; 264-

65; 314-22; 326; 338; 334-35].

The ALJ also pointed to Webb's reported activities of daily living,

which included driving, shopping, and performing some light household

chores.  [R. 8-2, Tr. 16, 19].  The record supports the ALJ's descriptions of

Webb's daily activities.  [R. 8-2, Tr. 41; R. 8-6, 191-93].  The ALJ was

entitled to consider these activities when determining Webb's limitation.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997).

The Court finds that the ALJ's credibility determination and her

conclusion that Webb is capable of frequent handling are supported by

substantial evidence of record and should not be disturbed.

### C.    Dr. Vora's Opinion

Webb argues that the ALJ violated the treating physician opinion rule

by giving little weight to Dr. Vora's January 30, 2014, medical source

statement, which indicated that Webb had poor functionality due to her

mental illnesses.  [R. 11, PgID 391-92, citing to R. 8-7, Tr. 340-41].  The

"treating physician rule" requires an ALJ to give controlling weight to a

treating physician's opinions regarding the nature and severity of a

claimant's condition when those opinions are well supported by medically

acceptable clinical and diagnostic evidence, and not inconsistent with other

substantial evidence.  *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d

at 242-43.  To justify giving Dr. Vora's opinions little weight, the ALJ cited

the fact that Dr. Vora had examined Webb only once in several years

before issuing the opinion, and concluded that the opinion did not comport

with Dr. Vora's own notes from that appointment or Dr. Saeed's treatment records.  [R. 8-2, Tr. 20-21].  The Court finds the ALJ's decision to give Dr. Vora's opinion little weight is supported by the record.

First, Dr. Vora's medical source statement does not qualify as an opinion from a treating source that is entitled to controlling weight.  The opinions of treating sources are generally given controlling weight because they reflect detailed, longitudinal pictures of the claimants' impairments.  20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Therefore, some frequency of treatment is required in order for a physician to be considered a treating source.  "A physician qualifies as a treating source if the claimant sees her with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition."  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007) (citations and internal quotation marks omitted).  In *Cruse*, the court found that the ALJ did not err when not giving controlling weight to the opinion of a physician who had examined the claimant only once before rendering the opinion.  *Id.*

In this case, Dr. Vora saw Webb in 2011, and discharged her with a good prognosis.  [R. 8-7, Tr. 294-308].  Webb returned to Dr. Vora on January 14, 2014, and the medical source statement was filled out two

24

weeks later.  [*Id.*, Tr. 289-93, 340-41].  As in *Cruse*, the ALJ here was warranted in finding that the opinions set forth in that statement did not provide the detailed, longitudinal picture necessary to be given controlling weight as a treating physician opinion.

Webb misconstrues the record to argue that the ALJ erred in considering her gap of her treatment with Dr. Vora.  She alleges that the gap in psychiatric treatment was due to her loss of insurance coverage, and cites her own testimony in support.  [R. 11, citing R. 8-2, Tr. 36-37]. However, the testimony Webb cites indicates that she had been taking Xanax as prescribed by Dr. Saeed for the past two or three years, and her loss of insurance coverage was *prior* to that period.  [R. 8-2, Tr. 36-37]. Further, Dr. Vora's treatment notes show that she was discharged from treatment in 2011 because she was improved, [R. 8-7, Tr. 294], and Webb testified that Dr. Saeed referred her to return to Dr. Vora out of "concern[ ] about my depression setting back in."  [R. 8-2, Tr. 43].  Thus, the gap in psychiatric treatment was not the result of a loss of insurance, and the ALJ did not err in finding that that lengthy gap in treatment contradicted Dr. Vora's opinion that Webb was profoundly disabled.

The ALJ was also accurate when she noted that Dr. Vora's treatment notes did not reflect the type of severe impairments described in his

medical source statement.  The treatment notes described Webb as depressed and tearful, but not profoundly limited.  [*Id.,* Tr. 289-93].  Her prognosis was fair and the estimated length of treatment was six months. [*Id.*, Tr. 293].  In contrast, two weeks later, Dr. Vora described Webb's capabilities as poor in every category except that she had a fair ability to maintain personal appearance.  [*Id.*, 340-341].

The Court additionally agrees with the ALJ's conclusion that Dr. Saeed's records do not demonstrate a level of depression or anxiety that would support Dr. Vora's extreme limitations.  Indeed, Dr. Saeed's reports from 2013 focused on Webb's physical ailments, providing minimal discussion of Webb's depression and anxiety and no examinations of her mental capacity.  [R. 8-7, Tr. 324-38].

For these reasons, the Court finds no error in the ALJ's decision to give Dr. Vora's medical source statement little weight.

**IV.      CONCLUSION**

The Court is satisfied that the ALJ's decision is legally sound and supported by substantial evidence of record.  As a result, the Court **RECOMMENDS** that Webb's Motion for Summary Judgment **[R. 11]** be **DENIED**, the Commissioner's Motion **[R. 12]** be **GRANTED** and this case be **AFFIRMED**.

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: April 24, 2015

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P.

72(b)(2). Failure to file specific objections constitutes a waiver of any

further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.*

*Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*,

638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation.  *Willis v. Secretary of*

*HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"

etc., and **must specify** precisely the provision of this Report and

Recommendation to which it pertains.  Not later than fourteen days after

service of objections, **the non-objecting party must file a response** to

the objections, specifically addressing each issue raised in the objections in

the same order and labeled as "Response to Objection #1," "Response to

Objection #2," etc.  The response must be **concise and proportionate in**

**length and complexity to the objections**, but there is otherwise no page

limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 24, 2015.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager